Sean P. TUMLISON  *v.*  STATE of Arkansas

CA CR 04-1367                    216 S.W.3d 620

Court of Appeals of Arkansas
Opinion delivered November 9, 2005

*John F. Gibson, Jr.*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brent P. Gasper*, Ass't Att'y Gen., for appellee.

WENDELL L. GRIFFEN, Judge. Sean Tumlison appeals from the sentence he received for his conviction for computer fraud. He argues that the trial court erred in not submitting the issue of restitution to a jury and by ordering excessive restitution. Appellant does not challenge the sufficiency of the evidence to support the conviction. We hold that appellant waived his right to a jury trial with regard to the calculation of restitution. However, we agree that the trial court ordered excessive restitution. Accordingly, we reverse and remand.

Appellant was charged with computer fraud, theft of property worth over $2500, and five counts of second-degree forgery. Scott Woodward, criminal investigator for the Arkansas State Police, began his investigation by looking at business records provided by Paula McMahan, district manager for Johnson's Warehouse-Showroom. He took statements from various people who purchased furniture from the store. Some of the contracts he saw indicated that the customer returned the merchandise, but in at least two cases, he went to the customer's home and discovered that the customer had not made a return. During an interview with appellant, appellant stated that he told McMahan about the account for a friend of his. Appellant told Woodward that he was being pressured to collect on the account and that he started a scheme to get his employer off his back. The scheme involved taking money from one account to cover another. When that account became due, he would pay the old account with a new one.

Ricky Ellis testified that he purchased a stainless steel refrigerator for his business. He stated that he did not buy the refrigerator immediately; however, appellant marked the refrigerator as "sold" and held it for him. Thirty days later, Ellis received a bill for the refrigerator. He told appellant that he had been billed for the refrigerator, and appellant told him that he would mark the refrigerator as unsold and then "sell" it again. Ellis actually purchased the refrigerator six months later. He was shown a contract indicating a purchase of various other appliances; however, he stated that he did not sign the contract. He also stated that he got behind on his payments in early 2002 and that appellant started coming to him and asking for payment.

Robert Leonard testified that he worked at Pauline Baptist Church. He stated that one Sunday, he made an appeal to the church for new furniture. Appellant later showed Leonard a couple of sectionals in the store's warehouse. Appellant told Leonard that he wanted to donate them to the church, and Leonard accepted them. Leonard was shown a purchase agreement indicating that the church had purchased two glider rockers, two gliders, and a sectional. He testified that the church only received the sectional. The purchase agreement stated a purchase price of $2623.47; however, Leonard testified that no payment plan was discussed and that he did not sign the agreement. The State also presented the testimony of several other customers who noticed either inconsistences with the purchase agreement and the actual agreement or fraudulent signatures on contracts.

John Johnson, part owner of Johnson's Warehouse-Showroom, testified that appellant was an excellent manager but that "it just kind of fell apart." Regarding the Ellis account, Johnson testified that appellant sold more than $7000 worth of appliances for about a $700 markup from wholesale, which was cheaper than any employee could buy them. Johnson testified that he pressed appellant to stay on top of Ellis over this deal. Ellis eventually paid the account. On cross-examination, Johnson testified that appellant was taking money from other accounts to pay on Ellis's account. He noted that, when he checked the computer, he discovered several outstanding accounts. Johnson learned of appellant's scheme after he started calling customers.

Paula McMahan was called to talk about the investigation. Her direct testimony went into the specifics of appellant's scheme. On cross-examination, she testified that her investigation took approximately three months. The investigation started when she noticed that the company had money posted to an account for which it was not intended. A collection for J.R. Jackson was the first one that alerted McMahan to the problem. When calculating the loss to the business, she counted the difference between the contract that appellant wrote for the customer and the money collected from that customer. The company was holding appellant responsible for any shortage in profits.

After hearing all of the testimony in the case, the jury found appellant guilty of computer fraud but acquitted him on the theft and forgery charges. The following colloquy then occurred:

> THE COURT: The verdicts will be received then and then tendered to the Clerk for insertion in the court

file. Approach the bench, counsel. Do y'all want to submit the sentencing to the jury?

MR. GIBSON [COUNSEL FOR APPELLANT]: I don't know that we really need to. He's already —

MR. CASON [COUNSEL FOR THE STATE]: Let me talk to my people and see if they're agreeable to a certain number of years and I'll —

MR. GIBSON: We'd go the max.

MR. CASON: The max is six.

MR. GIBSON: How about five?

MR. CASON: Wait a minute now.

MR. GIBSON: Back up one. Ask him about five.

MR. CASON: How about five supervised and one unsupervised.

MR. GIBSON: Oh, no, no, no. Let's just go five supervised.

MR. CASON: Well —

MR. GIBSON: See what he says.

THE COURT: I might let you talk to them and —

MR. CASON: Let me talk to them.

[*after a brief recess*]

MR. CASON: Five years supervised is fine.

THE COURT: Okay. Thank y'all. Ladies and gentlemen, normally, the case would at this time be submitted to you regarding your deliberations on the sentence to be imposed. However, in this case, the parties have agreed what the recommended sentence should be and that is five years supervised probation, and this has been agreed

to between the parties so we don't need to keep y'all any longer for any further deliberations or considerations. I thank you for your work the last three days. You're excused tomorrow and you can be dismissed at this time if you would like to be. In fact, I'm probably going to delay sentencing in order for some paperwork to be done at a later date, and so I'll dismiss y'all at this time if you would like to be.

*[jury is dismissed]*

THE COURT: Counsel, regarding the sentencing, I know what the recommendation is. I suppose that, I guess, conditions of the probation are open for discussion argument. Now, I know we've got to do some paperwork, in order for Mr. Tumlison to have those conditions, whatever they might be. I suggest that we set this for sentencing hearing. It would be the most reasonable way to do it.

MR. GIBSON: That's what the defendant would move, Your Honor, if the Court would do that, sentencing hearing, the first opportunity of the Court.

·   ·   ·

THE COURT: Okay. Well, we'll put this back on the docket then and I'll order Mr. Tumlison back. Let's take it up on May 17th. Since we're going to have other people here that day, too, let's set it at 3:00 p.m. and we'll take it up at that time, and I'll excuse Mr. Tumlison and order him back at to court at that time. We'll be in recess.

At the sentencing hearing, McMahan testified that Johnson's suffered losses of $40,614.15 due to appellant's computer fraud. The losses were broken into three categories. The first category represented losses where no payment was posted. For example, McMahan noted the J.R. Jackson account, where appellant wrote a fraudulent contract of $5294.88 but was paid with a check for only $4500. Appellant had put the money on three other accounts and did not credit Jackson's account. The company paid sales tax on $5294.88. There were eleven other instances, allegedly costing Johnson's $16,140.78.

Next, McMahan accounted a $10,902.40 loss for fraudulent contracts to cover inventory. For example, she noted $2453.31 for Pauline Baptist Church. Appellant intended to pay for the inventory but did not. In addition, the contract was in the name of the church when it should have been in appellant's own name. Other contracts of this type included contracts for items that appellant purported were returned but were not and contracts for items for which there was no payment.

Finally, McMahan noted a loss of $13,570.97, which represented the time that she and Johnson spent finding and fixing the computer problems. She noted that Johnson spent ninety-two hours finding the problem, which she calculated to be worth $2300. She stated that she spent three months fixing the problems and calculated that twenty-five percent of her salary went to fixing the problem when she could have been doing something else. McMahan calculated her time to be worth $11,270.97.

Appellant testified that the first set of accounts where no payment was posted was a result of swapping accounts to cover the Ellis account. He stated that nothing prevented the company from posting payments on those accounts. Regarding the second set of fraudulent contracts, appellant testified that he did not see where Johnson's had lost money. He stated that the contracts were drafted to get the items off the inventory books. Appellant also testified that, while Johnson's paid sales tax on the contracts, it should have been credited with the sales tax they paid when the item was "returned." Appellant also calculated what the Pauline Baptist Church contract cost Johnson's. He stated that Johnson's lost $204 in commissions, $1097.80 from the cost of the furniture given to the church, and $98.80 in sales tax. This came to $1400.60, which he was willing to pay.

On cross-examination, appellant stated that there would be no way for Johnson's to recover the sales tax it paid on the contracts to which there were no payments posted. Regarding the fraudulent contracts, appellant stated that the contracts should have been redone. He discussed one account, the Reinhart account. He noted that the oven the Reinharts wanted was still in the warehouse when he left Johnson's. The contract had not been paid because the oven had not been delivered. He concluded that his opinion was simply different from McMahon's regarding the $10,902.40 figure.

The trial court ordered appellant to pay $29,429.95 in restitution. It noted that the computer fraud began to cover up the

$5000 owed on the Ellis account; however, the fraud went much further than that. It found that Johnson's was entitled to the $13,570.97 that Johnson's requested for fixing the problem. It also found that Johnson's was entitled to its out-of-pocket expenses for the fraud, which included sales tax paid. Regarding the Pauline Baptist account, the court allowed $1400, the amount appellant stated he owed. For the remainder of the damages claimed by Johnson's, the trial court stated that markup on Johnson's inventory was about fifty percent and that the markup represented out-of-pocket expenses.

Appellant argues that the trial court erred by ordering him to pay restitution. He first contends that he did not waive his right to sentencing by a jury; thus, the issue of restitution should have been a question for the jury. Alternatively, he contends that he did not agree to the amount of restitution as a condition of his probation.

Arkansas Code Annotated section 5-4-205 (Supp. 2005) provides in relevant part:

> (a)(1)(A) A defendant who is found guilty or who enters a plea of guilty or nolo contendere may be ordered to pay restitution.
>
> . . .
>
> (2)(A) The sentencing authority, whether the trial court or a jury, shall make a determination of actual economic loss caused to a victim by the crime.
>
> . . .
>
> (3)(A) The determination of the amount of loss is a factual question to be decided by the preponderance of the evidence presented to the sentencing authority during the sentencing phase of a trial.
>
> (B) The amount may be decided by agreement between a defendant and the victim represented by the prosecuting attorney.
>
> . . .
>
> (c) If the defendant is placed on probation or any form of conditional release, any restitution ordered under this section shall be a condition of the suspended imposition of sentence, probation, parole, or transfer.

Appellant contends that he did not waive his right to sentencing by jury; however, the record shows the contrary. Rule 31.2 of the Arkansas Rules of Criminal Procedure requires that, if

a defendant wishes to waive his right to trial by jury, he must do so personally, either in writing or in open court. Waiver is defined as "an intentional relinquishment of a known right." *Calnan v. State*, 310 Ark. 744, 748, 841 S.W.2d 593, 595 (1992) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

■ Here, appellant's counsel negotiated a probation term of five years, then agreed to have a sentencing hearing on the conditions for probation *after* the trial court dismissed the jury. This constitutes a waiver of sentencing by jury. Appellant states that the waiver was ineffective because "[t]he record reflects that all discussions concerning the sentencing phase of the trial were between the Court, the prosecuting attorney and *defense counsel*" (emphasis added). However, appellant cannot sit idly by while his counsel proceeds to waive his right to a jury. *See Johnson v. State*, 314 Ark. 471, 863 S.W.2d 305, *reh'g denied*, 314 Ark. 471, 868 S.W.2d 42 (1993). Appellant's right to sentencing by jury was effectively waived.

Appellant also relies on Ark. Code Ann. § 5-4-303 (Supp. 2003), the statutory provision regarding the conditions that a court can impose on probation. Subparagraph (h)(1)(A) provides:

> If the court suspends the imposition of sentence on a defendant or places him or her on probation conditioned upon his or her making restitution or reparation under subdivision (c)(8) of this section, the court, by concurrence of the victim, defendant, and the prosecuting authority, shall determine the amount to be paid as restitution.

Appellant reads this statute to mean that if the court imposes restitution, the victim, defendant, and prosecuting attorney must agree on the amount. He also relies on the supreme court's interpretation of the statute in *Brimer v. State*, 295 Ark. 20, 746 S.W.2d 370 (1988), where the supreme court stated:

> If the court suspends the imposition of sentence or places her on probation conditioned upon making restitution as provided by Ark. Code Ann. § 5-4-303, payment must be in an amount she can afford to pay and the victim, defendant and prosecuting attorney must agree on the amount. This section of the code appears to be aimed at allowing an accused to remain out of prison so long as satisfactory payments of restitution are being made. Immediate imprisonment would thwart such intent. Section 5-4-303 is available to the trial courts if deemed just and proper.

*Id.* at 27, 746 S.W.2d at 374. However, that same case noted that Ark. Code Ann. § 16-90-305 (which has since been repealed and replaced by Ark. Code Ann. § 5-4-205) allowed the prosecuting attorney to make a recommendation about what amount of restitution would be proper and allowed the defendant to introduce evidence in mitigation of the amount recommended.

■ We agree with the State's interpretation of Ark. Code Ann. § 5-4-303. The statute authorizes the court to set the amount of restitution if the victim, defendant, and prosecuting attorney agree to allow the court to do so. Without the phrase "by concurrence of the victim, defendant, and the prosecuting authority," the latter portion of subparagraph (h)(1)(A) reads, "[T]he court shall determine the amount to be paid as restitution." The additional phrase imposes the condition upon which the court would make that determination, that condition being the victim, defendant, and prosecuting attorney agreeing to allow the court to do so. Appellant's interpretation of the statute would lead to an interpretation inconsistent with allowing the trier of fact to determine restitution as allowed by Ark. Code Ann. § 5-4-205. Accordingly, appellant did not have to agree with the amount of restitution before the trial court imposed that amount.

■ Next, appellant argues that the amount of restitution ordered by the trial court was excessive. Specifically, he argues that restitution should have been limited to the Ellis account and that because the account was eventually paid, no restitution was due. Restitution is meant, as far as it is practicable, to make the victim whole with respect to the financial injury suffered. *Nix v. State*, 54 Ark. App. 302, 925 S.W.2d 802 (1996). When compensating a victim for actual losses suffered, compensation may include an amount over and above the actual value of the interest that is the subject of the case. Therefore, we disagree with appellant's contention that restitution could not be more than what was owed on the Ellis account.

However, we hold that the trial court's award of restitution was indeed excessive. Arkansas Code Annotated section 5-4-205 requires the sentencing authority to make a determination of "actual economic loss." *See also Donovan v. State*, 71 Ark. App. 226, 32 S.W.3d 1 (2000). The cost to investigate appellant's fraud does not constitute actual economic loss. Furthermore, it is the function of law enforcement to investigate violations of the law. Johnson's

investigatory expenses, for the purposes of this criminal proceeding, were self-incurred. It cannot recover those losses from appellant. It is, however, entitled to incur actual economic losses resulting from appellant's fraud, which at a minimum includes excess taxes and commissions paid on non-existent sales.

Therefore, we reverse the award of restitution and remand this case with instructions to hold another hearing and award restitution based on Johnson's actual economic loss.

Reversed and remanded.

VAUGHT and ROAF, JJ., agree.